T.C. Summary Opinion 2019-1

UNITED STATES TAX COURT

CHRISTOPHER JOHN TOTTEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10691-14S.                          Filed January 29, 2019.

Christopher John Totten, pro se.

Peter T. McCary and A. Gary Begun, for respondent.

SUMMARY OPINION

ASHFORD, <u>Judge</u>:  This case was heard pursuant to the provisions of

section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.  Some monetary amounts are rounded

(continued...)

Pursuant to section 7463(b), the decision to be entered is not reviewable by any other Court, and this opinion shall not be treated as precedent for any other case.

By statutory notice of deficiency dated February 6, 2014, respondent determined the following deficiencies in petitioner's Federal income tax, additions to tax pursuant to section 6651(a)(1), and accuracy-related penalties pursuant to section 6662(a) for the 2009 and 2010 taxable years (years at issue):

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Accuracy-related penalty sec. 6662(a) |
|------|-----------|--------------------------------|---------------------------------------|
| 2009 | $18,364 | $3,052 | $3,673 |
| 2010 | 33,755 | 7,107 | 6,751 |

After concessions, the following issues remain for decision:

(1) whether an individual retirement account (IRA) distribution of $43,503 that petitioner received was a taxable distribution for 2010;

(2) if so, whether petitioner is liable for the 10% additional tax imposed by section 72(t) on the IRA distribution for 2010;

(3) whether the payment of $2,968 that petitioner received was taxable gross receipts he should have reported on Schedule C, Profit or Loss From Business, for 2010;

---

[1](...continued)
to the nearest dollar.

(4) whether petitioner is entitled to deductions claimed on Schedule A, Itemized Deductions, for unreimbursed employee business expenses of $27,953 and $26,460, amounts greater than respondent allowed, for 2009 and 2010, respectively;

(5) whether petitioner is entitled to Schedule A miscellaneous itemized deductions of $89 for tax preparation fees and $1,963 for attorney's and accountant's fees for 2009 and $106 for tax preparation fees for 2010;

(6) whether petitioner is entitled to a Schedule A deduction for charitable contributions of $18,414, an amount greater than respondent allowed, for 2009;

(7) whether petitioner is entitled to a deduction of $8,000 for repair expenses claimed on Schedule E, Supplemental Income and Loss, for 2009;

(8) whether petitioner is entitled to a capital loss deduction of $3,000 claimed on Schedule D, Capital Gains and Losses, for 2010;

(9) whether petitioner is entitled to residential energy credits of $2,130, an amount greater than respondent allowed, for 2009 and $183 for 2010;

(10) whether petitioner is entitled to a first-time homebuyer credit of $5,625 for 2010; and

(11) whether petitioner is liable for additions to tax for failure to timely file a tax return for the years at issue.

We resolve all issues in favor of respondent.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioner resided in Florida when he timely filed his petition with the Court.

I.   Petitioner's Medical Sales Work

During the years at issue petitioner was a medical sales representative, working as a full-time "W-2 wage earner" for an employer and as an independent contractor primarily for a medical sales company.[2] As an employee petitioner sold and provided repair services for medical equipment, medical supplies, and computer systems. As an independent contractor he sold small accessories that complemented his employer's medical products and that his employer did not sell.

Petitioner worked out of his home office and drove his 2004 Mercedes Benz E500 (2004 Mercedes) to various medical facilities and hospitals within his designated geographical territory of Central Florida to sell the medical products of his employer and the medical sales company. Because the medical products

_____

[2]Petitioner's Form 1040, U.S. Individual Income Tax Return, for 2009 (2009 return) included two Forms 1099-MISC, Miscellaneous Income, one from the medical sales company and one from a medical center.

complemented each other, petitioner drove the same route and visited the same physicians and hospitals for both his employer and the medical sales company each week. Petitioner would occasionally travel outside the designated geographical territory of his employer, but when he did so it was by plane, an expense for which his employer reimbursed him. His employer did not, however, reimburse travel expenses within his designated geographical territory.

## II.    Petitioner's Additional Income in 2010

In 2010 the parent company of one of petitioner's clients asked him to install a computer server and a workstation. Petitioner purchased the computer server, the necessary software, and the workstation and installed them for the parent company. He received $2,968 from the parent company in 2010.

Petitioner also received an IRA distribution of $43,503 in 2010. As of the close of 2010 petitioner was under 59½ years of age.

## III.    Petitioner's Real Property

During the years at issue petitioner resided at all times at his home on Bimini Drive (Bimini property) in Orlando, Florida, which he purchased in 2004. Petitioner purchased a condominium on Travini Circle (Travini property) in Sarasota, Florida, in 2005 as an investment property and rented it to tenants during the years at issue. On June 1, 2010, petitioner purchased a property on L.B.

McLeod Road (McLeod property) in Orlando, Florida, but he did not reside at the property in 2010.

IV.     2009 Tax Return

Petitioner used tax preparation software to prepare his 2009 return and filed it late, on September 6, 2011.  On the 2009 return he listed the Bimini property address as his home address.  He reported wages of $153,926 ($153,026 paid from his employer and $900 paid from a financial services employer), $7 of ordinary dividends, and $900 of other income from a Form 1099-MISC.[3]

Petitioner attached to the 2009 return a Schedule A, a Schedule C, and a Schedule E.  He claimed $66,727 of itemized deductions on the Schedule A, a $24,474 deduction on the Schedule C for a net loss for his business as a medical sales representative, and a $9,821 deduction on the Schedule E for a rental real estate loss for the Travini property.

A.     Schedule A for 2009

As relevant here, on the Schedule A petitioner claimed a deduction of $18,414 for noncash charitable contributions and miscellaneous deductions (before application of the 2% floor of section 67(a)) of $30,005.  A Form 8283,

---

[3]The record does not include a copy of a Form 1099-MISC reporting $900 for 2009, and neither petitioner nor respondent explained whether this reported amount related to petitioner's work as a medical sales representative.

Noncash Charitable Contributions, attached to the 2009 return, provided the details of petitioner's Schedule A noncash charitable contributions. In Part I of Section A of this form, captioned "Donated Property $5,000 or Less and Certain Publicly Traded Securities--Information on Donated Property", he reported donating clothes, computers, and furniture with an aggregate reported fair market value of $2,164 to a donation center, and in Part I of Section B of this form, captioned "Donated Property Over $5,000 (Except Certain Publicly Traded Securities)--Information on Donated Property", petitioner reported donating to a foundation "[n]ew toys, [h]ousehold items, money"[4] with an aggregate reported appraised fair market value of $16,250.

The Schedule A miscellaneous deductions consisted of $27,953 for unreimbursed employee business expenses, $89 for tax preparation fees, and $1,963 for attorney's and accountant's fees. According to a Form 2106-EZ, Unreimbursed Employee Business Expenses, attached to the 2009 return, petitioner's unreimbursed employee business expenses consisted of $18,089 for passenger automobile expenses using the standard mileage rate and $9,864 for business expenses other than passenger automobile expenses, parking fees, tolls,

---

[4]In the description of donated property, following "money" is a word beginning with the letter "c" that is cut off by the next column.

transportation, travel expenses, and meal and entertainment expenses. On the Form 2106-EZ petitioner reported driving his passenger automobile 32,889 miles for business, zero miles for commuting, and 3,162 miles for other purposes.

B.     Schedule C, Schedule E, and Credits for 2009

As relevant here, on the Schedule C petitioner reported total gross receipts of $2,628 from the medical sales company and the medical center and total expenses of $27,102, including $18,089 for car and truck expenses. On the Schedule E petitioner reported, among other things, $850 of rental income and $16,107 of total expenses, including $8,000 for repairs, for the Travini property.

Petitioner also claimed a residential energy efficient property credit of $2,130, shown on a Form 5695, Residential Energy Credits, for qualified geothermal heat pump property costs of $7,100 related to the Bimini property.

V.     2010 Tax Return

Petitioner used tax preparation software to prepare a Form 1040 for 2010 (2010 return) and filed it late, on October 3, 2011. On the 2010 return he listed the McLeod property address as his home address. He reported wages of $110,523 (paid from his employer) and $36 of taxable interest. He also reported $43,503 as an "IRA distribution" on line 15a of the 2010 tax return, with "ROLLOVER" noted next to line 15a, and reported zero as the "Taxable amount"

of the IRA distribution on line 15b. Petitioner attached to the 2010 return a Schedule A, a Schedule C, and a Schedule D. He claimed $34,286 of itemized deductions on the Schedule A, a $692 deduction on the Schedule C for a net loss for his business as a medical sales representative, and a $3,000 deduction on the Schedule D for a net long-term capital loss (after the limitation imposed by section 1211(b)).

A.    Schedule A for 2010

As relevant here, on the Schedule A petitioner claimed a deduction (before application of the 2% floor of section 67(a)) of $26,566 for miscellaneous deductions consisting of $26,460 for unreimbursed employee business expenses and $106 for tax preparation fees. According to a Form 2106-EZ attached to the 2010 return, petitioner's unreimbursed employee business expenses consisted of $16,801 for passenger automobile expenses using the standard mileage rate, $153 for travel expenses while away from home overnight, $25 for meals and entertainment expenses (after reducing the amount by the 50% limitation imposed by section 274(n)), and $9,481 for business expenses other than passenger automobile expenses, parking fees, tolls, transportation, travel expenses, and meal and entertainment expenses. On the Form 2106-EZ petitioner reported driving his

passenger automobile 33,601 miles for business, zero miles for commuting, and 1,889 miles for other purposes.

### B. Schedules C and D for 2010

As relevant here, on the Schedule C petitioner did not report any gross receipts or the $2,968 he received from the parent company in 2010.

On the Schedule D petitioner reported long-term capital losses consisting of $42,250 from the sale of 306.1620 shares of Munder Growth Opportunities Fund Class A (Munder Growth) and $452 from the sale of 32.3450 shares of Davis New York Venture Fund Class A (Davis NY Venture). On the Schedule D petitioner reported the following:

| Property | Date acquired | Date sold | Sale price | Cost or other basis |
|---|---|---|---|---|
| Munder Growth | May 15, 2003 | Oct. 13, 2010 | $8,000 | $50,250 |
| Davis NY Venture | May 15, 2003 | Oct. 13, 2010 | 1,048 | 1,500 |

### C. Credits for 2010

Petitioner also claimed a nonbusiness energy property credit of $183, shown on a Form 5695, for qualified natural gas, propane, or oil furnace or hot water boiler costs of $610 related to the Bimini property. Lastly, petitioner claimed a credit of $5,625 on a Form 5405, First-Time Homebuyer Credit and Repayment of the Credit. On the Form 5405 petitioner listed a property on Marathon Avenue

(Marathon property) in Orlando, Florida, as the home qualifying for the credit. Petitioner reported purchasing the property on June 1, 2010, and entering into a binding contract to purchase the property before May 1, 2010.

## Discussion

### I. Burden of Proof

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct and, except for the burden of production in any court proceeding with respect to a taxpayer's liability for any "penalty, addition to tax, or additional amount", see sec. 7491(c), the taxpayer bears the burden of proving otherwise, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of production remains on the taxpayer even with respect to the additional tax under section 72(t) because the section 72(t) additional tax is a "tax" and not a "penalty, addition to tax, or additional amount" within the meaning of section 7491(c). See Elaine v. Commissioner, T.C. Memo. 2017-3, at *6 (and cases cited thereat).

However, for this presumption to adhere in cases (such as this one) involving unreported income, the Commissioner must provide some reasonable foundation connecting the taxpayer with the income-producing activity. See Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), aff'g T.C. Memo.

1991-636. Once the Commissioner has done this, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. Helvering v. Taylor, 293 U.S. 507, 515 (1935). It is undisputed that during the years at issue petitioner was a medical sales representative. Petitioner also conceded that he received $2,968 from the parent company of one of his clients. On the basis of this credible and undisputed evidence, we are satisfied that respondent has proved a likely source of the unreported income.[5] Thus, the burden of proof shifts to petitioner to show that respondent's determination in regard to the unreported income was arbitrary or erroneous.[6]

_____

[5]As noted, supra pp. 8-9, petitioner did report on his 2010 return that he received an IRA distribution of $43,503 (but reported zero as the taxable amount).

[6]We also note that, under sec. 6201(d), if a taxpayer asserts a reasonable dispute with respect to an item of income reported on an information return filed by a third party and the taxpayer meets certain other requirements, the Commissioner bears the burden of producing reasonable and probative evidence, in addition to the information return, concerning the portion of the deficiency attributable to the income item. Petitioner has not raised a reasonable dispute with respect to the accuracy of income reporting by the third parties here. Indeed, he concedes that he received the reported income. To the extent petitioner attempts to dispute the accuracy of the reporting, see infra pp. 13, 16, we conclude in any event it is not reasonable under sec. 6201(d), see, e.g., Carlson v. Commissioner, T.C. Memo. 2012-76; Hyde v. Commissioner, T.C. Memo. 2011-131. Accordingly, the burden of production with respect to the income in this case does not shift to respondent under sec. 6201(d).

Petitioner does not otherwise contend that the burden of proof should shift to respondent under section 7491(a) as to any relevant issue of fact, nor has he established that the requirements for shifting the burden of proof under section 7491(a)(2) have been met. Accordingly, the burden of proof remains on petitioner.

## II. Taxability of IRA Distribution and Additional Tax Under Section 72(t)

Petitioner conceded that he received an IRA distribution of $43,503 in 2010. However, petitioner reported the IRA distribution as a nontaxable rollover on his 2010 return. Section 408(d)(1) provides that any amount paid or distributed out of an IRA is included in the gross income of the payee or distributee as provided under section 72. An amount will not be treated as a taxable distribution from an IRA if it is a qualified rollover. Sec. 408(d)(1), (3). A distribution is considered a qualified rollover distribution if the entire amount an individual receives is paid into a qualifying IRA or other eligible retirement plan within 60 days of the distribution. Sec. 408(d)(3). Petitioner testified that he used the funds to pay medical expenses. The IRA distribution did not therefore meet the requirements for a qualified rollover distribution. We sustain respondent's determination that the IRA distribution was a taxable distribution for 2010.

Section 72(t) imposes an additional 10% tax on early distributions from a qualified retirement plan, including an IRA, made to a taxpayer before he attains the age of 59½. See secs. 72(t)(1), (2)(A)(i), 4974(c)(4). Petitioner had not attained the age of 59½ when he received the distribution at issue. The IRA distribution was therefore an early distribution subject to the additional 10% tax.

The additional 10% tax, however, does not apply for certain enumerated exceptions. See sec. 72(t)(2). Petitioner asserts that the exceptions for a distribution attributable to the individual's being disabled within the meaning of section 72(m)(7) and a distribution made to an individual for medical care expenses apply to his distribution. See sec. 72(t)(2)(A)(iii), (B).

Section 72(m)(7) provides that a person shall be considered "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." The regulations provide that "[a]n individual will not be deemed disabled if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity." Sec. 1.72-17A(f)(4), Income Tax Regs. Whether an impairment constitutes a "disability" is

to be determined by considering all of the facts in the case. Sec. 1.72-17A(f)(2), Income Tax Regs.

Although petitioner submitted evidence that sufficiently proves that during the year at issue he had a serious medical illness, he was employed full time throughout 2010 as a medical sales representative. According to petitioner's mileage logs for the years at issue, he drove between 71 and 240 miles on a given day within his designated geographical territory. His 2009 and 2010 returns, apart from the IRA distribution in 2010, show that his employment was his primary source of income during those years. Petitioner's work with his employer and as an independent contractor with the medical sales company required him to travel daily within his designated territory to sell medical equipment. We do not doubt that petitioner's illness placed certain limitations on him. However, his illness clearly did not prevent him from engaging in "substantial gainful activity". See id. subpara. (4). We find that petitioner was therefore not "disabled" within the meaning of section 72(t)(2)(A)(iii).

Further, petitioner did not present any evidence to support his contention that he used the funds from the IRA distribution to pay for medical care expenses in 2010.

On the record before us, we find that none of the enumerated statutory exceptions applies to petitioner. We sustain respondent's determination to impose the section 72(t) additional tax on the total amount of the IRA distribution for 2010.

III.   Schedule C Gross Receipts

Petitioner conceded that he received $2,968 from the parent company in 2010. Respondent determined that petitioner should have reported that income as Schedule C gross receipts. Petitioner asserts that the amount was not taxable income but rather reimbursement for items he had purchased on behalf of the parent company.

Section 61(a) defines gross income as "all income from whatever source derived", including compensation for services, whether furnished by the taxpayer as an employee, a self-employed person, or an independent contractor, and gross income derived from a business. See sec. 61(a)(1) and (2); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Petitioner argued at trial that the payments from the parent company were to reimburse him for his purchases of the computer server and the workstation he had installed for them in 2010. While reimbursement may be a possible explanation for the payments, petitioner's assertions are not supported by credible evidence.

Petitioner introduced at trial only the bottom portion of a check stub with an invoice date of June 14, 2010, for $1,905 and the notation "SERVER" as the description. Petitioner testified that this payment was a reimbursement for his purchase of the computer server and that he received a separate check as reimbursement for his purchase of the workstation. However, the check stub neither states the name of the payor nor provides an explanation of the description. Moreover, petitioner did not present any evidence showing he had purchased the computer server and the workstation.

Even if petitioner had been reimbursed for his purchases of the computer server and the workstation, he would have been compensated in some amount for the accompanying services he provided to the parent company to install the equipment. On his 2010 Schedule C, however, petitioner reported zero gross receipts and did not provide any evidence, including testimony, as to whether that income was reported elsewhere on his 2010 return. Petitioner also did not provide any testimony to establish whether his services for the parent company were services provided through his employer. Accordingly, we sustain respondent's determination to include the $2,968 from the parent company in petitioner's income as Schedule C gross receipts for 2010.

IV.    Deductions

Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  This burden requires the taxpayer to demonstrate that the claimed deductions are allowable pursuant to some statutory provision and to substantiate the expenses giving rise to the claimed deductions by maintaining and producing adequate records that enable the Commissioner to determine the taxpayer's correct liability.  Sec. 6001; Higbee v. Commissioner, 116 T.C. 438, 440 (2001); Hradesky v. Commissioner, 65 T.C. 87, 89-90 (1975), aff'd per curiam, 540 F.2d 821 (5th Cir. 1976).

A.    Schedule A Deductions for Unreimbursed Employee Business Expenses for the Years at Issue

Petitioner claimed Schedule A deductions for unreimbursed employee business expenses for the years at issue in the following categories as reported on his 2009 and 2010 Forms 2106-EZ:  (1) passenger automobile expenses using the standard mileage rate for the years at issue; (2) business expenses other than passenger automobile expenses, parking fees, tolls, transportation, travel expenses, and meals and entertainment expenses for the years at issue; (3) travel expenses

while away from home overnight for 2010; and (4) meal and entertainment expenses for 2010.

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. See sec. 162(a); sec. 1.162-1(a), Income Tax Regs. Generally, the performance of services as an employee constitutes a trade or business. Primuth v. Commissioner, 54 T.C. 374, 377 (1970). Unreimbursed employee business expenses are generally deductible under section 162(a), subject to the 2% floor of section 67(a).

A taxpayer cannot deduct employee business expenses to the extent he is entitled to reimbursement from his employer for those expenses. See Lucas v. Commissioner, 79 T.C. 1, 7 (1982). The taxpayer bears the burden of proving that he is not entitled to reimbursement from his employer for such expenses. See Fountain v. Commissioner, 59 T.C. 696, 708 (1973). The taxpayer can prove that he is not entitled to reimbursement by showing, for example, that he is expected to bear these costs. See id. at 708. An expense for which the taxpayer is entitled to (but does not claim) reimbursement from his employer is generally not considered "necessary" and thus is not deductible under section 162. Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), aff'g T.C. Memo. 1984-533; Podems v. Commissioner, 24 T.C. 21, 22-23 (1955).

Whether an expense is deductible under section 162 is a question of fact to be decided on the basis of all the relevant facts and circumstances. Cloud v. Commissioner, 97 T.C. 613, 618 (1991) (citing Commissioner v. Heininger, 320 U.S. 467, 473-475 (1943)). Under the Cohan rule, if the taxpayer establishes that an expense is deductible but is unable to substantiate the precise amount, the Court may estimate the amount of the deductible expense, bearing heavily against the taxpayer whose inexactitude is of his own making. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); see also Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In order for the Court to estimate the amount of a deductible expense, the taxpayer must establish some basis upon which an estimate may be made. Norgaard v. Commissioner, 939 F.2d 874, 879 (9th Cir. 1991), aff'g in part, rev'g in part T.C. Memo. 1989-390; Vanicek v. Commissioner, 85 T.C. at 742-743. Otherwise an allowance would amount to "unguided largesse." Norgaard v. Commissioner, 939 F.2d at 879 (quoting Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957)).

The Cohan rule, however, is superseded--that is, estimates are not permitted--for certain expenses specified in section 274, such as traveling expenses (including meals and lodging while away from home), entertainment expenses, and "listed property" (including passenger automobile) expenses. Secs.

274(d), 280F(d)(4)(A)(i); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985) (flush language); see Boyd v. Commissioner, 122 T.C. 305, 320 (2004). Instead, these types of expenses are subject to strict substantiation rules. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., supra. These strict substantiation rules generally require the taxpayer to substantiate with adequate records or by sufficient evidence corroborating the taxpayer's own statement (1) the amount of the expense; (2) the time and place the expense was incurred; (3) the business purpose of the expense; and (4) in the case of an entertainment expense, the business relationship between the person entertained and the taxpayer. Balyan v. Commissioner, T.C. Memo. 2017-140, at *7; sec. 1.274-5T(b), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). For "listed property" expenses, including passenger automobile expenses, in addition to the time such expenses were incurred and their business purpose, the taxpayer must establish the amount of the business use and the total use of such property. Balyan v. Commissioner, at *7-*8; sec. 1.274-5T(b)(6)(i)(B), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985). Generally, deductions for meal and entertainment expenses are subject to the 50% limitation imposed by section 274(n).

Substantiation by adequate records requires the taxpayer to maintain (1) an account book, diary, log, statement of expense, trip sheet, or similar record prepared contemporaneously with the expenditure and (2) documentary evidence, such as receipts or paid bills, which together provide each element of an expenditure.  Balyan v. Commissioner, at *8; sec. 1.274-5(c)(2)(iii), Income Tax Regs.; sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

Petitioner testified that his employer did not reimburse expenses for travel within his designated geographical territory but it did reimburse for expenses, including out of pocket expenses, for travel outside of his designated geographical territory as well as expenses for large dinners and educational seminars.  Petitioner did not produce a copy of his employer's reimbursement policy although he testified that he had a copy of it.  While we find his testimony credible as to his employer's reimbursement policy, petitioner has failed to substantiate his expenses by adequate records or by sufficient evidence corroborating his own statement.

### 1.    Passenger Automobile Expenses

Petitioner claimed deductions for expenses for his 2004 Mercedes, a passenger automobile, using the standard mileage rate, of $18,089 and $16,801 for 2009 and 2010, respectively.  Expenses for a passenger automobile cannot be

estimated because they are subject to the strict substantiation rules of section 274(d). See sec. 1.274-5(j)(2), Income Tax Regs. Respondent conceded that petitioner was entitled to a deduction of $7,907 for expenses for his 2004 Mercedes for 2009.

On his Forms 2106-EZ petitioner reported driving his 2004 Mercedes 32,889 miles for business, zero miles for commuting, and 3,162 miles for other purposes in 2009 and 33,601 miles for business, zero miles for commuting, and 1,889 miles for other purposes in 2010. Petitioner testified that his work with his employer and as an independent contractor for the medical sales company required him to travel to various medical facilities and hospitals within his designated geographical territory to sell medical equipment. Petitioner also testified that he traveled the same route from his home office to the same medical facilities and hospitals for both his employer and the medical sales company because the medical products complemented each other. Petitioner introduced monthly mileage logs for the years at issue and to substantiate the expenses for his 2004 Mercedes. Petitioner testified that the mileage reported in the mileage logs was attributable only to his travel within his designated geographical territory and not to travel outside that territory. The record does not indicate whether petitioner maintained the mileage logs contemporaneously. Even if they were maintained

contemporaneously, we do not find that petitioner's mileage logs for the years at issue adequately meet the strict substantiation rules of section 274(d) or are credible.

The monthly mileage logs for the years at issue list four weeks per month from Monday to Friday without any corresponding dates and list the names of medical facilities or hospitals with a corresponding figure representing an alleged mileage calculation. The mileage logs fail to identify a business purpose for the miles recorded, including whether sales were made for his employer or the medical sales company or both at each location. According to the mileage logs, petitioner drove a total of 28,752 business miles and 11,849 business miles in 2009 and 2010, respectively, for his business, less than the figures reported on the Forms 2106-EZ for both years.

Furthermore, petitioner's mileage logs are also contradicted by a maintenance report petitioner introduced for his 2004 Mercedes. According to the maintenance report, petitioner's 2004 Mercedes was driven 32,986 total miles between April 24, 2009, and January 31, 2011, whereas petitioner reported on his mileage logs driving 40,601 business miles alone between May 2009 and December 2010.

Accordingly, we sustain respondent's disallowance of the Schedule A deductions for passenger automobile expenses for 2009 in excess of what respondent has already allowed, and 2010.[7]

### 2. Other Business Expenses

Petitioner also reported other business expenses of $9,864 and $9,481 for 2009 and 2010, respectively, in connection with his employment as a medical sales representative. Respondent conceded that petitioner was entitled to a deduction of (1) $175 for cellular phone services for 2009, (2) $1,200 for storage expenses for each of the years at issue, and (3) $1,531 for various other expenses for 2010. At trial petitioner did not testify or produce records to identify and substantiate any other business expenses for 2009 or 2010 in excess of what respondent has allowed. Petitioner has not established that these other expenses were paid or incurred or that they were ordinary and necessary. Accordingly, we sustain respondent's disallowance of the Schedule A deductions for other business expenses for the years at issue in excess of what respondent has already allowed.

---

[7]The Court notes that for 2009 petitioner reported expenses of $18,089 for his 2004 Mercedes on both his Schedule A and Schedule C. In addition to the conceded Schedule A deduction of $7,907 for expenses for his 2004 Mercedes for 2009, respondent also conceded that petitioner was entitled to a Schedule C deduction of $7,907 for car and truck expenses for his medical sales trade or business for 2009 for the 2004 Mercedes.

3.  Travel and Meal and Entertainment Expenses

Lastly, petitioner reported travel expenses while away from home overnight of $153 and meal and entertainment expenses of $25 for 2010. Travel and meal and entertainment expenses cannot be estimated because they are subject to the strict substantiation rules of section 274(d). Petitioner did not testify or produce documents to identify and substantiate these expenses. Petitioner thus has not established that these expenses were paid or incurred or that they were ordinary and necessary. We sustain respondent's disallowance of the Schedule A deductions for travel and meal and entertainment expenses for 2010.

B.  Schedule A Deductions for Tax Preparation Fees for 2009 and 2010 and Attorney's and Accountant's Fees for 2009

Petitioner claimed Schedule A miscellaneous deductions (before application of the 2% floor of section 67(a)) of $89 and $106 for tax preparation fees for 2009 and 2010, respectively, and $1,963 for attorney's and accountant's fees for 2009. Petitioner testified that he used tax preparation software to prepare his 2009 and 2010 tax returns but did not provide any testimony to explain the attorney's and accountant's fees for 2009. Regardless, petitioner at trial did not offer any testimony or records or other sufficient evidence to substantiate these expenses.

We sustain respondent's disallowance of these Schedule A miscellaneous deductions for the years at issue.

      C.     Schedule A Deduction for Charitable Contributions for 2009

Petitioner claimed a Schedule A deduction of $18,414 for noncash contributions for 2009.  A taxpayer may deduct charitable contributions made during the taxable year.  Sec. 170(a)(1).  A charitable contribution is defined as "a contribution or gift to or for the use of" a charitable organization.  Sec. 170(c).  However, deductions for charitable contributions are allowed only if the taxpayer satisfies statutory and regulatory substantiation requirements.  See sec. 170(a)(1); sec. 1.170A-13, Income Tax Regs.  The required substantiation depends on the size of the contribution and on whether it is a gift of cash or property.

For any contributions of cash, checks, or other monetary gifts, the taxpayer must substantiate each contribution with a bank record (i.e., canceled check) or a written communication (i.e., receipt or letter) from the charitable organization showing the name of the organization, the date of the contribution, and the amount of the contribution.  Sec. 170(f)(17).  For any contributions of property other than money, the taxpayer must substantiate each contribution with a receipt (e.g., letter or other written communication) from the charitable organization showing (1) the name of the organization, (2) the date and location of the contribution, and (3) a

description of the property in reasonably sufficient detail (though the fair market value need not be stated). Sec. 1.170A-13(b)(1), Income Tax Regs.

For any contributions of $250 or more,[8] the taxpayer must substantiate the contribution with a "contemporaneous written acknowledgment" from the charitable organization. Sec. 170(f)(8)(A). The written acknowledgment must include: (1) the amount of cash and a description (but not the value) of any property other than cash contributed, (2) whether the charitable organization provided any goods or services in consideration for the contribution, and (3) a description and good-faith estimate of the value of any goods or services provided by the charitable organization, or if such goods and services consist solely of intangible religious benefits, a statement to that effect.[9] Sec. 170(f)(8)(B); sec. 1.170A-13(f), Income Tax Regs. The acknowledgment is "contemporaneous" if the taxpayer obtains it from the charitable organization on or before the earlier of: (1) the date the taxpayer files a tax return for the year of contribution or (2) the

[8]"Separate contributions of less than $250 are not subject to the requirements of sec. 170(f)(8), regardless of whether the sum of the contributions made by a taxpayer to a donee organization during a taxable year equals $250 or more." Sec. 1.170A-13(f)(1), Income Tax Regs.

[9]Sec. 170(f)(8)(D) provides an exception to the contemporaneous written acknowledgment requirement. Petitioner does not assert that this exception applies.

due date, including extensions, for filing that tax return. Sec. 170(f)(8)(C). In the absence of a contemporaneous written acknowledgment meeting the statute's requirements, "[n]o deduction shall be allowed". Sec. 170(f)(8)(A).

To substantiate a contribution exceeding $500 the taxpayer is required to maintain additional reliable written records for each item of donated property. Sec. 170(f)(11)(A); sec. 1.170A-13(b)(2) and (3), Income Tax Regs. These records must include, among other things: (1) the approximate date the property was acquired and the manner of its acquisition, (2) a description of the property in detail reasonable under the circumstances, (3) the cost or other basis of the property, (4) the fair market value of the property at the time it was contributed, and (5) the method used in determining its fair market value. Sec. 170(f)(11)(B); sec. 1.170A-13(b)(2)(ii)(C) and (D), 3(i), Income Tax Regs.

There are also more rigorous substantiation requirements for contributions of property exceeding $5,000. Sec. 170(f)(11)(C). To substantiate a contribution exceeding $5,000 the taxpayer must also (1) obtain a "qualified appraisal"[10] of the items and (2) attach to his tax return a fully completed "appraisal summary".[11]

---

[10]Sec. 170(f)(11)(E)(i) and sec. 1.170A-13(c)(3)(ii), Income Tax Regs., provide rules governing the requirements for a qualified appraisal.

[11]Sec. 1.170A-13(c)(4), Income Tax Regs., provides the rules governing the

(continued...)

Sec. 170(f)(11)(A), (C); sec. 1.170A-13(c)(2), Income Tax Regs.  The IRS has prescribed Form 8283 to be used as the appraisal summary.  Costello v. Commissioner, T.C. Memo. 2015-87, at *15; Jorgenson v. Commissioner, T.C. Memo. 2000-38, 2000 Tax Ct. Memo LEXIS 38, at *25.

"[S]imilar items of property" must be aggregated in determining whether gifts exceed the $500 or $5,000 thresholds.  Sec. 170(f)(11)(F).  The term "similar items of property" is defined as "property of the same generic category or type", such as clothing, furniture, electronic equipment, household appliances, toys, and everyday kitchenware.  Sec. 1.170A-13(c)(7)(iii), Income Tax Regs.

On his 2009 Form 8283 petitioner reported that on March 10, 2009, he donated clothes, computers, and furniture to the donation center with an aggregate fair market value of $2,164; that the date acquired was "various"; that the contributed items were acquired by purchase; that he had a cost or adjusted basis in the contributed items of $10,478; and that "consignment shop" was the method used to determine the fair market value.  On the 2009 Form 8283 petitioner also reported that he donated to the foundation new and unopened toys, household items, and money with an appraised fair market value of $16,250 and with

---

[11](...continued)
requirements for an appraisal summary.

December 2009 as the date acquired; that the contributed items were acquired by purchase; that he had a cost or adjusted basis in the contributed items of $16,250; and that their overall physical condition was "brand new items unopened". At trial petitioner argued that a portion of his noncash contributions also included the value of a vehicle--a 1998 Mercedes C280W (1998 Mercedes)--he had donated in 2009.

Respondent conceded that petitioner substantiated $3,709 of noncash charitable contributions[12] and $135 of cash charitable contributions[13] for 2009. Respondent contended that petitioner is entitled neither to a deduction for the remaining amount, $14,570, of noncash contributions to the donation center and the foundation nor to any deduction for the vehicle donation because of lack of substantiation. We agree with respondent.

With respect to the contribution of money to the foundation listed on his 2009 Form 8283, petitioner did not offer any testimony or records to identify and substantiate this cash contribution.

_____

[12]Respondent did not specify whether the conceded amount of $3,709 was attributable to noncash contributions to the donation center, the foundation, or both.

[13]Petitioner introduced at trial two letters from separate charitable organizations acknowledging receipt of his cash donations of $100 and $35.

At trial petitioner introduced (1) three handwritten receipts from the donation center dated March 10, April 4, and August 8, 2009, listing various donated items;[14] (2) four photographs of toys and individuals collecting the toys; (3) an in-kind donation form from the foundation for a donation on December 21, 2009, listing the donated items as "305 New Toys, 2 Bicycles, 1 Blanket" with an estimated value of $6,250; (4) a letter from the foundation dated January 11, 2010, acknowledging receipt of petitioner's "generous contribution of holiday gifts"; and (5) a bill of sale for the 1998 Mercedes, listing the date petitioner purchased the vehicle as December 24, 2007, for a cash value of $9,025.

With respect to the contributions of property, we must aggregate similar items to determine what substantiation was required because the aggregate values of the claimed contributions of property exceed $5,000. The property petitioner allegedly donated may be grouped into the following categories: clothing, furniture, electronic equipment, household items, household appliances, toys,

---

[14]The March 10, 2009, receipt lists: "4 Computer Monitors, 6 Dell Desktop 6x270, 1 19" TV, 1 Office Chair, 1 Desk, 2 Bags of Clothing, 1 King Bed Set, 2 HP Printers, 1 Coffee table, bag of cookware, 1 Polaroid Camera, 1 Pair Boots, 15 Dress Shirts, 1 Mini Refrigerator--Pepsi". A portion of the April 4, 2009, receipt is cut off, including the year, because of how the document was copied, but respondent did not object to its being admitted on that basis. This receipt lists: "Clothing, Glass, Dishes, Christmas". The August 8, 2009, receipt lists: "1 HP Desktop Computer".

kitchenware, and a vehicle. Except with respect to the vehicle as discussed below, petitioner's failure to maintain adequate records makes it impossible to itemize values for each category in order to determine what substantiation was required for each category. Petitioner testified that the aggregate value of the property donated to the donation center was based on the value assigned by the donation center to similar items for sale at the time of the donation. He also testified that the aggregate estimated value he listed in the foundation's in-kind donation form, $6,250, was based on the actual costs of the items. Petitioner contended that he had saved the receipts for each item to document his donation but had attached the receipt to the items when they were donated to the foundation. Petitioner testified that he had kept an itemized list of the donations to the foundation in a notebook where he had written the name of the item and the assigned value but no longer had this notebook.

Even so, petitioner failed to satisfy any of the substantiation requirements for the noncash contributions. He did not provide respondent or the Court with a contemporaneous written acknowledgment from the donation center or the foundation for the donations. Additionally, he did not maintain written records establishing when or how the donated items were acquired or their cost. Petitioner also did not maintain written records establishing how he calculated the fair

market values for the donated items. Petitioner acknowledged at trial that he did not obtain a qualified appraisal for any of the donated items. Petitioner also did not attach a fully completed appraisal summary to his 2009 return; his 2009 Form 8283 lists "various" for the dates the items donated to the donation center were acquired and fails to contain the signature of petitioner, the appraiser, or the foundation for the items donated to the foundation. See sec. 1.170A-13(c)(4), Income Tax Regs. He therefore failed to satisfy the substantiation requirements for any contributions of property exceeding $250, $500, or $5,000 in value.

With respect to the contribution of the vehicle, petitioner contended that he donated the 1998 Mercedes in 2009. Section 170(f)(12)(A)(i) provides that a taxpayer is not entitled to a deduction for a contribution of a "qualified vehicle"[15] with a claimed value exceeding $500 unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment[16] of the contribution by the charitable organization. Petitioner testified that he donated the vehicle to a women's charity whose name he could not remember. He acknowledged he did

---

[15]Sec. 170(f)(12)(E) provides rules governing the requirements for a qualified vehicle.

[16]Sec. 170(f)(12)(B) provides rules governing the requirements for a contemporaneous written acknowledgment to substantiate the contribution of a qualified vehicle.

not have a receipt to show to whom and when the vehicle was donated but believed he had valued the vehicle at around $9,000 using the Kelly Blue Book. Petitioner merely provided testimony and not any additional documentation to substantiate the vehicle donation, including a contemporaneous written acknowledgment or an appraisal summary for a donation of property exceeding $5,000. See sec. 170(f)(11)(C); sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs.

We do not doubt that petitioner donated property to the donation center and the foundation in 2009. However, the Code imposes a series of increasingly rigorous substantiation requirements for larger gifts, especially when they consist of property rather than cash. Petitioner did not satisfy the substantiation requirements under section 170 and the regulations thereunder. Accordingly, we sustain respondent's disallowance of the Schedule A noncash charitable contribution deduction for 2009 in excess of what respondent has already allowed.

D.    Schedule E Deduction for Repairs for 2009

Petitioner claimed a Schedule E deduction of $8,000 for repairs to the Travini property for 2009. Sections 162 and 212 generally permit a taxpayer to deduct ordinary and necessary business expenses paid or incurred during the taxable year in carrying on a trade or business or for the production of income. The taxpayer may deduct amounts paid for repairs and maintenance to property if

the amounts paid are not otherwise required to be capitalized. Sec. 1.162-4(a), Income Tax Regs. Capital expenditures include amounts paid for permanent improvements or betterments made to increase the value of property. INDOPCO, Inc. v. Commissioner, 503 U.S. at 83; see sec. 263(a)(1).

Petitioner testified that he had installed granite countertops in the kitchen, carpets in the bedrooms, and hardwood floors in the remaining rooms of his rental property, the Travini property. Respondent contends that petitioner failed to substantiate that he paid the expenses in 2009 or the amounts of the expenses. In the alternative respondent argues that, even if petitioner did pay and substantiate the expenses, he is not entitled to deduct the cost of those repairs because they are capital expenditures. We agree with respondent that petitioner failed to substantiate that he had paid the expenses in 2009 and therefore do not need to address whether the expenditures are currently deductible or required to be capitalized.

Petitioner testified that he had placed receipts for the repairs in an envelope but could not find them. Petitioner introduced the following to substantiate the repairs to the Travini property: (1) an undated real estate listing that describes the upgrades, including "real wood flooring" and granite countertops in the kitchen; (2) a portion of an appraisal dated September 13, 2005, listing the flooring as

"Carpet/Vinyl(Good)"; (3) a document titled "Project Estimate Hardwood Install"

from Lowe's Companies, Inc., dated February 21, 2006, listing a total estimate of

$3,820;[17] and (4) five undated photographs of hardwood floors and the installation

of the countertops. While petitioner may have installed new hardwood floors,

carpets, and granite countertops at the Travini property, he did not produce any

documentation establishing that the renovations were paid for in 2009. We sustain

respondent's disallowance of the Schedule E deduction for repairs for 2009.

E. Schedule D Deduction for Capital Loss for 2010

Petitioner reported a net long-term capital loss of $42,702 on his 2010

Schedule D derived from the sale of the Munder Growth and Davis NY Venture

shares, which resulted in a $3,000 deduction after the limitations imposed by

section 1211(b). Section 165(a) allows a deduction for any loss sustained during

the taxable year and not compensated for by insurance or otherwise. A loss from

the sale or exchange of a capital asset is allowed as a deduction only to the extent

permitted in sections 1211 and 1212. Sec. 165(f). Section 1211(b) allows

---

[17]On the basis of petitioner's testimony at trial, the Court held the record open for the limited purpose of giving petitioner an opportunity to proffer certain evidence in support of certain claimed deductions. One of the proffered documents was this estimate, to which respondent reserved an objection on grounds of relevance and authenticity. We overrule respondent's objection.

noncorporate taxpayers to deduct losses on the sale or exchange of capital assets to the extent of the gain from such sales or exchanges, plus the lower of: (1) $3,000 or (2) the excess of such losses over such gains.

To be entitled to a deduction under section 165(a), a taxpayer is required to keep records to establish the deduction to which he is entitled. Sec. 6001. To deduct a section 165(a) loss from the sale or exchange of a capital asset the taxpayer must establish, among other things, his cost or adjusted basis for purposes of determining the loss he must recognize on a sale of the capital asset. See secs. 165(f), 1001(a), (c). The loss is equal to the excess of the adjusted basis over the amount realized. See secs. 1001(a) and (b), 1011(a). In certain circumstances, we may use the Cohan rule to estimate a taxpayer's basis in an asset at the time of transfer. See Grp. Admin. Premium Servs., Inc. v. Commissioner, T.C. Memo. 1996-451, 1996 Tax Ct. Memo LEXIS 469, at *37 n.16. For the Court to estimate basis, the taxpayer must provide some reasonable evidentiary basis for the estimate. Vanicek v. Commissioner, 85 T.C. at 742-743.

Respondent disputes petitioner's reported adjusted bases of $50,250 in the Munder Growth shares and $1,500 in the Davis NY Venture shares and, in turn, the resulting realized long-term capital losses of $42,250 and $452, respectively, from the sales of his shares on October 13, 2010. Respondent conceded that

petitioner substantiated a cost basis of $755 in the Davis NY Venture shares. However, respondent contends that petitioner has not substantiated any adjusted basis in the Munder Growth shares or an adjusted basis greater than $755 in the Davis NY Venture shares. On the basis of these contentions, respondent argues that, rather than capital losses, petitioner realized long-term capital gains of $8,000 in the Munder Growth shares and $293 in the Davis NY Venture shares in 2010.

Petitioner introduced at trial a UBS PaineWeber Resource Management Account statement (UBS statement) for the month of April 2003, the month before he acquired the Munder Growth and Davis NY Venture shares he sold on October 13, 2010. The UBS statement provided a summary of the values of the Munder NetNet Fund Class A (Munder NetNet Fund) shares and the Davis NY Venture shares, among other investments, that petitioner already owned in April 2003.[18] According to the UBS statement, the Munder NetNet Fund shares were valued at $12.22 per share and the Davis NY Venture shares were valued at $21.52 per share in April 2003.

---

[18]According to the UBS statement, petitioner had previously purchased Munder NetNet Fund shares on April 13, 2000, and Davis NY Venture shares on April 4, 2001. Petitioner had an adjusted basis of $755 in the Davis NY Venture shares he had purchased on April 4, 2001.

We find that petitioner has substantiated an aggregate adjusted basis in the Munder Growth shares of $12.22 per share for a total adjusted basis of $3,741. Respondent did not dispute in the notice of deficiency, at trial, or on brief that petitioner acquired 306.1620 Munder Growth shares on May 15, 2003. Petitioner testified that, although his 2010 Schedule D lists the shares as "Munder Growth Opportunities Fund Class A", the shares he sold were Munder NetNet Fund shares, implying that the fund had changed names sometime between the acquisition and sale dates. We find credible the implication that the mutual fund changed names during the course of petitioner's ownership of its shares. Under the Cohan rule, we find that the UBS statement serves as a reasonable evidentiary basis for an estimate. According to the UBS statement, the Munder Growth shares were priced at $12.22 per share in April 2003, about a month before petitioner purchased the 306.1620 shares he sold in 2010. We therefore conclude that petitioner has substantiated an aggregate adjusted basis of $3,741 (306.1620 shares purchased multiplied by $12.22 per share) in the 306.1620 Munder Growth shares he purchased on May 15, 2003. Consequently, petitioner realized a long-term capital gain of $4,259 ($8,000 sale price over $3,741 adjusted basis) from the sale of the 306.1620 Munder Growth shares in 2010.

Petitioner has not, however, substantiated an adjusted basis in the Davis NY Venture shares in excess of the amount respondent has conceded. The UBS statement does not support such a finding. Petitioner is therefore not allowed an additional adjusted basis in excess of the $755 respondent has conceded.[19] Consequently, petitioner realized a long-term capital gain of $293 ($1,048 sale price over $755 adjusted basis) from the sale of the 32.3450 Davis NY Venture shares in 2010.

Accordingly, we conclude that petitioner did not realize a net long-term capital loss but instead realized a net long-term capital gain of $4,552, consisting of a realized long-term capital gain of $4,259 from the sale of the Munder Growth shares and $293 from the sale of the 32.3450 Davis NY Venture shares in 2010. We sustain respondent's disallowance of the Schedule D net long-term capital loss deduction.

## V. Credits

Credits, like deductions, are a matter of legislative grace, and a taxpayer bears the burden of proving that he is entitled to any credit claimed. See Rule

---

[19]Respondent did not explain how he arrived at the conceded adjusted basis of $755 in petitioner's Davis NY Venture shares. That amount, perhaps coincidentally, corresponds to petitioner's adjusted basis in the Davis NY Venture shares he purchased on April 4, 2001, as reported on the UBS statement. See supra note 18.

142(a); <u>Deputy v. du Pont</u>, 308 U.S. 488, 493 (1940); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. at 440; <u>Segel v. Commissioner</u>, 89 T.C. 816, 842 (1987).

A.    Energy Credits for 2009 and 2010

Petitioner claimed a residential energy efficient property credit of $2,130 for 2009 and a nonbusiness energy property credit of $183 for 2010 related to the Bimini property.  Section 25D(a) allows a taxpayer a residential energy efficient property credit (section 25D credit) against tax in an amount equal to the sum of the following expenditures made by the taxpayer during the year:  (1) 30% of qualified solar electric property expenditures, (2) 30% of qualified solar water heating property expenditures, (3) 30% of qualified fuel cell property expenditures, (4) 30% of qualified small wind energy property expenditures, and (5) 30% of qualified geothermal heat pump property expenditures.[20]  Section 25C(a) allows the taxpayer a nonbusiness energy property credit (section 25C credit) against tax in an amount equal to 30% of the sum of the following expenditures by the taxpayer during the year:  (1) the amount paid for qualified energy efficiency improvements and (2) the amount paid for residential energy

---

[20]Sec. 25D(d) defines each type of expenditure.

property expenditures.[21]  The section 25C credits allowed for 2009 and 2010 under section 25C(a) cannot exceed $1,500 in the aggregate.  Sec. 25C(b).

According to his 2009 Form 5695, petitioner claimed a section 25D credit of 30%, or $2,130, based on "qualified geothermal heat pump property" costs of $7,100.  "Qualified geothermal heat pump property" is any equipment that "uses the ground or ground water as a thermal energy source to heat * * * [the taxpayer's residence] or as a thermal energy sink to cool * * * [the taxpayer's residence], and * * * meets the requirements of the Energy Star program" in effect at the time the expenditure was made.  Sec. 25D(d)(5)(B).  Petitioner argues that the section 25D credit was based on his purchases of an air conditioning system and four solar-powered vent fans in 2009.

The parties agree that petitioner substantiated the purchase of an air conditioning system for $6,250 for 2009.  However, respondent contends that petitioner is entitled to a section 25C credit, not a section 25D credit, because the air conditioning system does not meet any of the definitions of the property qualifying for a section 25D(a) credit.  Under that premise, respondent conceded that petitioner is entitled to a section 25C credit equal to 30% of the cost of the air

---

[21]Sec. 25C(c) and (d) defines a "qualified energy efficiency improvements" and "residential energy property expenditures", respectively.

conditioning unit, or $1,875, but that the amount is limited to $1,500 pursuant to section 25C(b).

Petitioner introduced at trial (1) an invoice from Crums Climate Control, Inc. (invoice), dated April 28, 2009, and (2) a Certificate of Product Ratings by the Air-Conditioning, Heating, and Refrigeration Institute (AHRI certificate) dated October 22, 2009. The invoice, among other things, describes the air conditioning system as an "A/C Condenser 4 Ton Heatpump York 2 Speed 140A" and lists five components of the air conditioning system with a model number for each component. The AHRI certificate is for a product listed as "Split System: Heat Pump with Remote Outdoor Unit-Air-Source" consisting of an outdoor and an indoor component. The model numbers for these two components match the model numbers of two out of the five components listed in the invoice. The AHRI certificate states: "This combination qualifies for a Federal Energy Efficiency Tax Credit when placed in service between Feb 17, 2009 and Dec 31, 2010". Petitioner argues that the AHRI certificate certifies his eligibility for the section 25D credit. Respondent argues that neither the invoice nor the AHRI certificate mentions the words "solar", "fuel cell", "wind", or "geothermal".

The IRS issued Notice 2009-41, 2009-19 I.R.B. 933, to provide interim guidance for the procedures that manufacturers could follow to certify property as

eligible for the section 25D credit and the conditions under which a taxpayer

claiming the section 25D credit could rely on the manufacturer's certification. The

notice states:

> (2) Taxpayer Reliance. * * * [A] taxpayer may rely on a manufacturer's certification in determining whether property is eligible for the credit under § 25D. A taxpayer is not required to attach the certification statement to the return on which the credit is claimed. However, § 1.6001-1 (a) of the Income Tax Regulations requires that taxpayers maintain such books and records as are sufficient to establish the entitlement to, and amount of, any credit claimed by the taxpayer. Accordingly, a taxpayer claiming a credit for residential energy efficient property should retain the certification statement as part of the taxpayer's records for purposes of § 1.6001-1(a).

Notice 2009-41, sec. 3.02(2), 2009-19 I.R.B. at 934. However, the AHRI

certificate is not a manufacturer's certificate because it specifically lists the

manufacturers for the outdoor and indoor components as "York, Unitary Products

Group" and "Advanced Distributor Products", respectively. Further, the AHRI

certificate does not contain the required content to constitute a valid

manufacturer's certificate statement.[22] Id. sec. 3.02(1). Petitioner did not present

---

[22]The IRS notice requires that the manufacturer's certification statement contain the following: (1) the name and address of the manufacturer; (2) identification of the property as a solar electric property, solar water heating property, fuel cell property, small wind energy property, or geothermal heat pump property; (3) the make, model number, and any other appropriate identifiers of the property; and (4) a declaration, signed by an authorized person. Notice 2009-41,

(continued...)

any other additional documentation to support his claim for a section 25D credit for the air conditioning system expenditures.

With respect to the solar-powered vent fans, petitioner testified that he purchased four fans for $175 each in 2009. Petitioner introduced at trial (1) five undated photographs of the installed solar-powered vent fans and (2) an Amazon.com printout dated May 3, 2016, of a "DC HOUSE 25W Solar Powered Attic Ventilator Gable Roof Vent Fan with 30W Foldable Solar Panel". Petitioner argues that the photographs demonstrate he purchased the solar-powered vent fans and that the Amazon.com printout demonstrates the price he paid. However, neither the photographs nor the printout establishes that the expenditures were made in 2009. We therefore do not need to decide whether the solar-powered vent fans qualified for the section 25D credit for 2009.

According to his 2010 Form 5695, petitioner claimed a section 25C credit of 30%, or $183, based on a "qualified natural gas, propane, or oil furnace or hot water boiler". Petitioner presented at trial (1) four undated photographs of the installation of a tankless electric water heater and (2) an undated one-page advertisement for "Tempra Whole House Tankless Electric Water Heaters". Here

---

[22](...continued)
sec. 3.02(3), (5), 2009-19 I.R.B. 933, 934.

too, neither the photographs nor the advertisement establishes that the expenditures were made in 2010. We therefore do not need to decide whether the water heater qualified for the section 25C credit for 2010. Even if petitioner had substantiated the expenditures for the water heater for 2010, he had already reached the $1,500 limitation for 2009 alone; and therefore under section 25C(b) he would not be allowed any credit for qualified property for 2010.

In sum, we sustain respondent's disallowance of the section 25D credit for 2009, and petitioner is entitled a section 25C credit of $1,500 as respondent conceded. We also sustain respondent's disallowance of the section 25C credit for 2010.

### B. First-Time Homebuyer Credit for 2010

Petitioner claimed a first-time homebuyer credit (FTHB credit) of $5,625 for 2010. Section 36(a) allows a first-time homebuyer of a principal residence a credit against tax of 10% of the purchase price of the principal residence. For purposes of this section, the term "principal residence" has the same meaning as in section 121. Sec. 36(c)(2). A first-time homebuyer is any individual who has had no present ownership interest in a principal residence during the three-year period ending on the date of the purchase of the principal residence in question. Sec.

36(c)(1). Section 36(c)(6) expands the scope of the FTHB credit by making it available to "long-time residents":

> In the case of an individual * * * who has owned and used the same residence as such individual's principal residence for any 5-consecutive-year period during the 8-year period ending on the date of the purchase of a subsequent principal residence, such individual shall be treated as a first-time homebuyer for purposes of this section with respect to the purchase of such residence.

The FTHB credit is available only for a principal residence purchased on or after April 9, 2008, and before May 1, 2010. Sec. 36(h)(1). Where the taxpayer enters into a written binding contract before May 1, 2010, the purchase deadline is extended to October 1, 2010. Sec. 36(h)(2).

The parties at trial, and respondent on brief, contended that petitioner claimed the FTHB credit for the McLeod property, even though petitioner's 2010 Form 5405 listed the Marathon property as the home qualifying for the FTHB credit.[23] Regardless of the property purchased, petitioner does not qualify for the first-time homebuyer credit because he failed to prove he entered into a written binding contract for the purchase before May 1, 2010.

---

[23]Line A of the 2010 Form 5405 states: "Address of the home qualifying for the credit(if different from the address shown on page 1 of Form 1040 or Form 1040X)". Petitioner's 2010 return listed the McLeod property as his home address.

On his Form 5405 petitioner reported that he purchased the residence on June 1, 2010, and at trial testified that he purchased the residence in June or July 2010. Petitioner therefore fails to meet the purchase deadline--May 1, 2010--under section 36(h)(1). To qualify for the extended purchase deadline--October 1, 2010--under section 36(h)(2), petitioner must establish that he entered into a written binding contract before May 1, 2010. Petitioner did not offer any testimony or documentation on when he entered into a written binding contract for either property. We sustain respondent's disallowance of the first-time homebuyer credit for 2010.

## VI. Additions to Tax

Finally, we address whether petitioner is liable for additions to tax under section 6651(a)(1) for failure to timely file his returns for the years at issue.

Section 6651(a)(1) imposes an addition to tax for a taxpayer's failure to file a required Federal income tax return on or before the specified filing date, including extensions. As noted supra p.11, the Commissioner bears the burden of production with respect to any addition to tax. Sec. 7491(c). The Commissioner satisfies his burden of production by providing sufficient evidence to show that the taxpayer filed his Federal income tax return late. Wheeler v. Commissioner,

127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Higbee v. Commissioner, 116 T.C. at 447.

The record includes petitioner's returns for 2009 and 2010, which were required to be filed by April 15, 2010, and April 18, 2011, respectively, see sec. 1.6072-1, Income Tax Regs., but were filed past these specified filing dates on September 6, 2011, and October 3, 2011,[24] respectively. Respondent has therefore met his burden of production with respect to the additions to tax under section 6651(a)(1) for the years at issue.

Application of the section 6651(a)(1) addition to tax may be avoided if the taxpayer shows that the failure to timely file was due to reasonable cause and not due to willful neglect. "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The taxpayer can show that he did not act with "willful neglect" if he can "prove that the late filing did not result from a 'conscious, intentional failure or reckless indifference.'" Niedringhaus v. Commissioner, 99 T.C. 202, 221 (1992) (quoting United States v. Boyle, 469 U.S. 241, 245-246 (1985)). The

---

[24]The parties stipulated that petitioner's 2010 return was filed late without an extension.

burden of showing reasonable cause under section 6651(a)(1) remains with petitioner. See Higbee v. Commissioner, 116 T.C. at 447-448.

Petitioner argues that he filed his returns for the years at issue late because he did not have some of the information necessary to complete these returns by the filing deadlines and he believed an extension was required only if the return resulted in a tax liability, not a refund. Such a belief does not establish reasonable cause or a lack of willful neglect. See Calloway v. Commissioner, 135 T.C. 26, 45-46 (2010) (finding that the taxpayers' belief that they would be entitled to a refund established neither reasonable cause nor the absence of willful neglect), aff'd, 691 F.3d 1315 (11th Cir. 2012).

Petitioner also argues that his health was not good in the years at issue. He testified that he suffered, and continues to suffer, from a medical condition that required him to have continuous blood and other lab work. Petitioner also testified that he suffered with sleep problems, low energy levels, and depression and that he was on medication during 2009 and 2010. Respondent argues that petitioner did not introduce any evidence showing that he was incapacitated when his returns for 2009 and 2010 were due or how his health problems prevented him from timely filing these returns. We agree with respondent.

Although we are sympathetic to petitioner's health problems, a taxpayer's selective inability to perform his or her tax obligations while performing his regular business and personal activities does not excuse his failure to file. See Godwin v. Commissioner, T.C. Memo. 2003-289, 2003 Tax Ct. Memo LEXIS 292, at *27. Despite his health problems, petitioner engaged in many normal activities, including being gainfully employed, driving throughout his designated geographical territory each week for work, managing his rental property, purchasing a third home, and engaging in charitable endeavors.

On the basis of the record before us, we find that petitioner did not have reasonable cause for failing to timely file his returns for the years at issue, and we sustain the additions to tax under section 6651(a)(1) for the years at issue.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under

Rule 155.